In the
UNITED STATES DISTRICT COURT
for the SOUTHERN DISTRICT OF INDIANA,
INDIANAPOLIS DIVISION

| | |
|---|---|
| **L. B. M.**, a minor by her mother Angeleeta Motley, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| *vs.* | )   **CAUSE NO.  1:08-cv-1354-WTL-DML** |
| | ) |
| **MICHAEL J. ASTRUE**, Commissioner of Social Security, | ) |
| | ) |
| | ) |
| Defendant. | ) |

# E N T R Y

The plaintiff was awarded Social Security disability benefits in 2000, when she was three years old.  In 2008, the defendant Commissioner of Social Security determined that she was no longer disabled and terminated her benefits.  The plaintiff now seeks judicial review of that determination.

Our standard of review is deferential:  we must uphold the Commissioner's decision if his factual findings are supported by substantial evidence in the record; review of legal errors, however, is *de novo*.  42 U.S.C. § 405(g); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004); *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).  Substantial evidence is more than a scintilla, but less than a preponderance, of the evidence.  *Wood v. Thompson*, 246 F.3d 1026, 1029 (7th Cir. 2001).  If the evidence is sufficient for a reasonable person to conclude that it adequately supports the Commissioner's decision, then it is substantial evidence.  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Carradine v. Barnhart*, 360

F.3d 751, 758 (7th Cir. 2004).  This limited scope of judicial review derives from the principle

that Congress has designated the Commissioner, not the courts, to make disability

determinations:

> In reviewing the decision of the ALJ, we cannot engage in our own analysis of
> whether [the claimant] is severely impaired as defined by the SSA regulations.
> Nor may we reweigh evidence, resolve conflicts in the record, decide questions of
> credibility, or, in general, substitute our own judgment for that of the
> Commissioner.  Our task is limited to determining whether the ALJ's factual
> findings are supported by substantial evidence.

*Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).  *Carradine*, 360 F.3d at 758.

The plaintiff ("Child") was receiving disability benefits under the Supplemental Security

Income ("SSI") program of the Social Security Act.  42 U.S.C. Chapter 7, Subchapter XVI,

§§1381 *et seq.*[1]  A child under the age of eighteen is eligible for SSI benefits if she has a

medically determinable mental or physical impairment that causes marked and severe functional

limitations and which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than twelve months.  *Id.* § 1382c(a)(3)(C)(i).  A physical

or mental impairment is one that results from anatomical, physiological, or psychological

abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic

techniques.  *Id.* § 1382c(a)(3)(D).  In determining whether impairments are disabling, the

combined effect of all of a child's impairments must be considered, without regard to whether

any single impairment alone is of disabling severity.  42 U.S.C. § 1382c(a)(3)(G).

---

[1] Two types of disability benefits are available under the Social Security Act:  Disability Insurance Benefits ("DIB") for persons who have achieved insured status through employment and withheld premiums, 42 U.S.C. § 423, *et seq.*, and Supplemental Security Income benefits ("SSI") for uninsured individuals who meet income and resources criteria, 42 U.S.C. § 1381, *et seq.*  A minor can be eligible for disability benefits under only the SSI program.

By regulation, the Social Security Administration ("SSA") has determined that satisfaction of one of the Listings of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, Part B, fulfills the statutory requirement that a child's impairment or combination of impairments "results in marked and severe functional limitations.".  The Listing of Impairments, Part B, is a compilation of medical conditions, divided into fourteen major body systems, that the SSA has pre-determined are disabling in children.  20 C.F.R. § 416.925.   In general, each listed condition is defined by two sets of criteria:  diagnostic findings that substantiate the *existence* of a listed condition and sets of related functional limitations that substantiate the condition's disabling *severity*.  *Id*.  A child's impairment or group of impairments can satisfy a listed condition in any of three ways:  by meeting all the listed criteria for the condition, 20 C.F.R. § 416.925(c)(3); by medically equaling the criteria, *id*. § 416.925(c)(5); or by functionally equaling the criteria, *id*. § 416.926a(a).

A child's impairment *meets* a listed condition only when it satisfies all of the criteria of the listing.  20 C.F.R. § 416.925(c)(3) and (d).  A child's impairment *medically equals* a listed condition when it is at least equal in severity and duration to the criteria of a listed condition.  *Id*. § 416.926(a).  Medical equivalence will be found when (1) the child's impairment, though listed, is lacking one or more of the medical or severity criteria, but other findings related to the impairment are of at least equal medical significance to the listed criteria, *id*. § 416.926(b)(1); (2) the child's impairment is not a listed condition but the impairment's medical and severity findings are of at least equal medical significance to a closely analogous listed condition, *id*. § 416.926(b)(2); or (3) the child has a combination of impairments, no one of which equals a listed condition, but the impairments' medical and severity findings are of at least equal medical

3

significance to a listed condition, *id*. § 416.926(b)(3).

A child's impairment or combination of impairments will *functionally equal* a listed condition when it is of listing-level severity, meaning that it results in a "marked" limitation in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). The domains of functioning are (1) acquiring and using information, (2) attending to and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for self, and (6) health and physical well-being, *id*. § 416.926a(b)(1), and SSA has defined constituent activities within each domain and their normal levels of performance at different age groups, *id*. § 416.926a(g)-(l). In general, a "marked" limitation exists when a child's impairment or combination of impairments "interferes seriously with [her] ability to independently initiate, sustain, or complete activities" within a particular domain. It is a limitation that is "more than moderate" but "less than extreme," and is the level of functioning that is expected with scores that are more than two, but less than three, standard deviations below the mean on standardized tests. *Id*. § 416.926a(e)(2). An "extreme" limitation is one that interferes "very seriously" with a child's ability to perform activities within a domain. It is "more than marked," and is the level of functioning that is expected with scores at least three standard deviations below the mean on standardized testing. *Id*. § 416.926a(e)(3).

SSA has prescribed a three-step sequential process for evaluating child-disability claims. 20 C.F.R. § 416.924. If disability eligibility can be determined at any step in the sequence, an application will not be reviewed further. *Id*. § 416.924(a). At the first step, if the child is engaged in substantial gainful activity, *i.e.*, is earning money, then she is not disabled. *Id*. §

417.924(b).  At the second step, if the child's impairments are not severe, then she is not disabled.  A severe impairment or combination of impairments is one that causes "more than minimal functional limitations."  *Id*. § 416.924(c).  Third, the child's impairments, either singly or in combination, must satisfy the criteria of at least one of the conditions included in Part B of the Listings of Impairments.  *Id*. § 416.924(d).  If a child's impairments pass all three steps, and satisfies the duration requirement, then she is deemed disabled.

In May 2000, when Child was a little over three years old, her mother ("Mother") filed an application for SSI disability benefits on Child's behalf, alleging that she became disabled on January 1, 1999.  (R. 100).  In the application papers, Mother stated that Child was disabled due to "behavior problems — bad temper" which limited her activities because Child "fights & throws fits — bites people."  (R. 181).  By checking boxes on a form, Mother reported that Child had severe limitations in communication, understanding and learning, physical activity, relating with other people, taking care of her personal hygiene and dressing needs, and paying attention. (R. 168-75).  This form was drafted for children from age three to their sixth birthday and its questions did not distinguish between expected functional limitations due to the child's normal developmental stage and extraordinary limitations attributed to the child's alleged disability.  In June 2000, Mother completed a daily-activities questionnaire in which she reported mostly behavioral problems with Child.  She reported that Child fights and disobeys her and other relatives; she doesn't play with her dolls very long before throwing and biting them; she doesn't play with friends very long before fighting with them; and she fights and hits her siblings.  Child puts her shoes on the wrong feet and Mother must help take care of all Child's personal needs (eating, drinking, bathing, dressing, toileting, toothbrushing, *etc*.), but Mother explained that she

5

assisted with these activities because Child is only three years old and just started using the toilet.  When asked to describe behavior problems and their frequency, Mother answered that Child has a bad behavior problem, engages in serious fighting every day, and doesn't do anything she is told to do.  Asked whether Child could be understood when speaking, Mother answered that she is unable to hear what Child is saying.  Mother reported that Child did not attend school yet.  (R. 166-67).

In October 2000, the state agency granted Child's application for disability benefits on its initial review.[2]  (R. 38).  The only documents in the Record that record the state agency's conclusions are the Disability Determination and Transmittal form completed by its reviewing disability examiner, (R. 38), and the Childhood Disability Evaluation Form completed by its reviewing medical specialist, (R. 222).  These forms reveal that the state agency concluded that Child had (1) a primary diagnosis of mental retardation; (2) a secondary diagnosis of ADD/ADHD [Attention Deficit Disorder / Attention Deficit Hyperactivity Disorder]; (3) a disability-onset date of May 2000; and (4) that she met the criteria for Listing 112.05D, mental retardation.  (*Id.*).  No other impairments were found.

The diagnostic and severity criteria of Listing 112.05D are:

> 112.05  *Mental Retardation*:  Characterized by significantly subaverage general intellectual functioning with deficits in adaptive functioning.
>
> The required level of severity for this disorder is met when the

---

[2] The initial stages of disability determinations in Indiana are performed by an agency of the state government — the Disability Determination Bureau, a division of the Indiana Family and Social Services Administration — under arrangement with the Social Security Administration.  20 C.F.R. Part 416, Subpart J (§ 416.1001 *et seq.*).

requirements in A, B, C, D, E, or F are satisfied.

\*       \*       \*

D.  A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant limitation of function;

\*       \*       \*

20 C.F.R. Part 404, Subpart P, Appendix 1, Part B, § 112.05D.  SSA has defined the "additional and significant limitation of function" requirement to mean that the additional impairment must be severe.  *Id*. § 112.00A.

The state agency's rationale for its determination does not appear in the Record but it is suggested by the evidence before it at the time.  The record consisted of Mother's descriptions of Child's condition recorded in the application documents described above, Child's medical records from two visits to Wishard Memorial Hospital in April 1998 and February 1999, (R. 231-34), and the reports of two psychological consultative examinations of Child that the state agency obtained, (R. 226-30, 236-39).  (R. 46, 69).  The first of these examinations was performed by a licensed psychologist when Child was 3 years and 4 months old and she concluded that Child "appeared delayed in all areas including language and social skills as well as activities of daily living.  . . .  It was not known if [Child's] delays were due to an impoverished environment, a birth or genetic defect, or a combination of both."  (R. 236, 238).  The examiner's final opinion was expressed according to the DSM IV multi-axial system:

Axis I (clinical disorders and other conditions that might be a focus of clinical attention): V61.10[3] Parent Child Relationship Problems.

_____

[3] It appears that the code should be V61.20.  *DSM-IV-TR*, Appendix E, p. 852.

Rule out 299.80  Pervasive Developmental Disorder.

Axis II (personality disorders and mental retardation):
        Rule out 317 Mild Mental Retardation.

Axis III (general medical conditions):
        None.

Axis IV (psychosocial and environmental problems):
        Family, Interpersonal.

Axis V (Global Assessment of Functioning rating):
        GAF = 45.

(R. 232-33); American Psychiatric Association, *Diagnositc and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision ("*DSM-IV-TR*"), p. 27 (2000).

The second examination was performed a little over two months later by a clinical psychologist.  (R. 226).  She administered a Wechsler Preschool and Primary Scale of Intelligence test which resulted in a full-scale IQ of 63.  (R. 228).  (The first examiner did not administer an IQ test.)  The examiner concluded:

> [Child] was cooperative with the examination process, although not highly motivated.  She was not inappropriate, but she did not interact very much.  It is the examiner's opinion that the test results are a valid representation of her level of intellectual functioning, which is in the mild mental retardation range.  It is possible that she is functioning a little lower than that.  It is not clear from her history and this evaluation that she has a pervasive developmental disorder.  She appears to have an attention deficit/hyperactivity disorder, although she is relatively young.  She probably has some difficulty attending and sitting.  Her communication skills, academic skills, self-help skills and community and family functioning are all below average.

(R. 228-29).  The examiner's *DSM-IV-TR* diagnoses were:

Axis I:        Attention Deficit/Hyperactivity Disorder, Combined Type (314.01).

Axis II:  mild mental retardation (317).

8

Axis III:  head cold, per mother's report.

Axis IV:  none, per mother's report.

Axis V:  current GAF of 45, highest GAF in the past year of 45.

(R. 229).

By statute, the Commissioner is required to review, no less frequently than once every three years, the continued eligibility of every minor who is found to be entitled to benefits due to an impairment, or combination of impairments, that is likely to improve and, at the Commissioner's option, that is unlikely to improve.  42 U.S.C. § 1382c(a)(3)(H)(ii).  By regulation, the Commissioner has provided for periodic "continued disability reviews" of every SSI recipient's eligibility.  20 C.F.R. §§ 416.989, 416.990, 416.994a(a).  Child's first review was diaried for September 2003, three years after she was found to be disabled.  (R. 38).

A continued disability review follows a three-step sequential evaluation process, 20 C.F.R. § 994a(b).  **First**, has there been medical improvement in the recipient's impairment(s) that were originally found disabling?  If not, then her disability is found to continue.[4]  Medical improvement is any decrease in the severity of an impairment that the recipient was found to have at the time benefits were granted, disregarding any minor changes that represent changes that obviously could not result in a finding that disability has ended.  *Id*. § 416.994a(c).  If

---

[4] Two exceptions apply:  (1) new or improved diagnostic techniques or evaluations demonstrate that the recipient's impairment(s) are not as disabling as originally thought, and (2) substantial evidence shows that the previous disability decision was in error (*e.g.*, evidence was misread; legal standards were misapplied; evidence that was originally missing becomes available; new evidence emerges that, if considered at the time, would have caused a finding of no disability).  20 C.F.R. §§ 416.994a(b)(1) and 416.994a(e).

medical improvement is found, then the evaluation continues to the second step.

**Second**, if there has been medical improvement, do the recipient's original impairments still meet or equal (medically or functionally) the severity of the Listings that were originally satisfied, as they were then written?  20 C.F.R. § 416.994a(b)(2).  If, despite the medical improvement, the recipient's impairments still meet or equal the original Listings, then her disability will be found to continue.  Otherwise, the evaluation proceeds to the third step.

**Third**, is the recipient currently disabled?  In other words, does she currently have a severe impairment or combination of impairments that meet, medically equal, or functionally equal one of the Listings of Impairments (regardless of her original impairments or the grounds for her original disability determination)?  20 C.F.R. § 416.994a(b)(3).[5]

The state agency makes an initial decision on a continued disability review based on an internal review of the evidence.  20 C.F.R. § 416.1402(b).  If a recipient is dissatisfied with an initial decision, then she may request reconsideration.  *Id*. § 416.1407, *et seq*.  A reconsideration decision will be made by a state-agency disability hearing officer ("DHO") after holding a hearing.  *Id*. §§ 416.1413(d), 416.1414, and 416.1415.  If dissatisfied with the reconsideration decision, a recipient may request a hearing before an administrative law judge ("ALJ"), an official of the SSA.  *Id*. § 416.1429, *et seq*.  If dissatisfied with the ALJ's decision, the recipient may request review by the SSA's Appeals Council.  *Id*. § 416.1466 *et seq*.  If the Appeals

_____

[5] Additional exceptions to all of these steps that may result in a finding of no disability are:  (1) a previous decision was fraudulently obtained, (2) the recipient fails to cooperate with the continued disability review, and (3) the recipient cannot be found.  20 C.F.R. § 416.994a(f).

Council denies review or affirms the ALJ's decision, the decision becomes the final decision of the Commissioner. *Id*. § 416.1481. The recipient may then seek judicial review of the Commissioner's decision by filing suit. 42 U.S.C. § 405(g).

Sometime in mid-2005, the state agency made an initial continued disability review decision, on medical grounds, that Child was no longer disabled.[6] Child, represented by counsel, requested reconsideration, (R. 19, 109, 116), and a hearing before a DHO was held in September 2005, (R. 57). In December 2005, the DHO issued a decision finding that Child's disability ceased in June 2005. (R. 43, 45). Child requested, (R. 42, 102), and received a hearing before an ALJ in May 2008, (R. 423). In August 2008, the ALJ issued his decision, agreeing with the DHO, that Child's disability ended in June 2005. (R. 11, 14). The Appeals Council denied Child's request for review, (R. 5), and Child filed the present suit for judicial review of the termination of her benefits.

In addition to the hearing testimony before the ALJ, the new evidence that was before the state agency and SSA regarding Child's continued disability review since the intial grant of benefits in 2000 consisted of:

1. **Forms** completed by Mother describing Child's condition: Questionnaire, undated (R. 144); Function Report, February 2005 (R. 152); and Report of Continuing Disability Interview, February 2005 (R. 134).

---

[6] The documents pertaining to the initial decision do not appear in the Record. A June 2005 Child Disability Evaluation Form is present on which a state-agency medical professional records his finding that Child's impairment, which he describes only as ADHD by history, is severe but does not meet, medically equal, or functionally equal the Listings. (R. 210). He also records that medical improvement has occurred. (*Id*.) Handwritten explanations of his findings are illegible. (R. 214, 215).

2. State-agency **questionnaire** completed by Child's teacher in April 2005. (R. 123).

3. May 2005 **psychological examination** conducted by Dr. Jerome **Modlik**, Psy.D., a clinical psychologist. (R. 204). This evaluation was obtained by the state agency as part of its continued disability review. Dr. Modlik examined Child and administered a standardized intelligence test. He concluded that Child was functioning in the low average range of intelligence. Reviewing behavior rating scales and reports supplied by the state agency, he found that Child was not showing significant behavior problems. He had serious doubts that Child had any true ADHD problems and he did not see strong evidence of emotional problems. His diagnosis was Parent/Child Relational Problems at Axis I and no disorder at Axis II. (R. 207-08).

4. June 2005 **Child Disability Evaluation Form** completed by F. **Kladder**, Ph.D., a state-agency reviewer, as part of the state agency's initial decision on its continued disability review. (R. 210). Dr. Kladder's specialty is not evident. On this form, Dr. Kladder checked applicable boxes and added a few brief explanations. He notes Child's only impairment as ADHD by history and finds that "M I [medical improvement] has occurred." He checked the box stating that Child's impairment or combination of impairments does not meet, medically equal, or functionally equal the Listings.

5. August 2005 **Childhood Disability Evaluation Form** completed by J. **Pressner**, Ph.D., a state-agency reviewer, as part of the state agency's reconsideration decision. (R. 198). Dr. Pressner's specialty is not evident. Like Dr. Kladder, Dr. Pressner noted Child's only impairment as ADHD by history. Dr. Pressner's findings and conclusions are the same that Dr. Kladder recorded on his form for initial review. In the explanation portion of the form, Dr. Pressner noted that "[n]o changes are alleged upon appeal" and that "no new or recent sources are given." (R. 203).

6. November 2005 **psychological examination** conducted by Howard E. **Wooden**, Ph.D., licensed clinical psychologist, board certified, at the request of the state agency. (R. 192). Dr. Wooden observed no behavior problems. He administered an intelligence test but Child's responses were described as bizarre and not expected based on previous test results. He opined that there was a strong possibility that her inappropriate responses were purposeful and malingering. The test results were not reliable and he was unable to give an IQ score. He felt that she functions in the low average range of intelligence based on past test results and history. His impression was an Axis I parent/child problem by history; no diagnosis for Axis II except low average IQ range based on previous testing; no Axis III diagnosis; and mild to moderate stressors for Axis IV. He was unable to give a GAF score.

12

The above evidence constituted the record before the state agency when it made its intial and reconsideration decisions on Child's continued disability review.  The following evidence was submitted subsequently:

7.  Medical records from **BehaviorCorp**, a provider of mental-health services, that was providing treatment to Child.  (R. 241-347).  These records were submitted four days before the ALJ's hearing.  (R. 359).  They date from Child's first visit in November 2004, for the assessment and treatment of ADHD and behavior problems, to the termination of services in October 2007.  BehaviorCorp's initial assessment was exhibition of oppositional behaviors that interfere with Child's ability to academically perform to her ability level.  Child was diagnose with Axis I (clinical disorders) diagnoses of rule-out ADHD and oppositional defiant disorder.  The termination summary records an additional Axis I diagnosis of major depressive disorder, recurrent, unspecified.  No disorders were diagnosed for either Axis II (personality disorders and mental retardation) or III (general medical conditions).  There are Axis IV (psychosocial and environmental problems) diagnoses of educational problems, problems with primary support group, and economic problems.  Child's Axis V GAF scores were initially diagnosed as 41-50 for both  current and highest past year and the termination summary gives current and highest-past-year GAF scores of 72.

8.  Medical records from Wishard Health Services' **Midtown Community Mental Health Center** from April 11, 2008 to May 23, 2008.  (R. 360-418).  These records were submitted about a month after the ALJ's hearing.  (R. 422).  Child was seen at the Center for treatment of ADHD symptoms.  Center personnel observed Child in the school setting and worked with Child's teachers and Mother to develop a plan and techniques to improve Child's behaviors.

In his decision, the ALJ found that the state agency determined that Child was disabled in October 2000 due to a combination of the severe impairments of mental retardation, a parent/child relationship problem, and ADHD which met the criteria of Listing 112.05D for mental retardation.  At step one of the continued-disability-review process, he found that medical improvement in her mental retardation had occurred as of June 17, 2005.  In making this finding, he relied on the intelligence test administered by Dr. Modlick that showed Child scoring in the

13

low average range of intellectual functioning, an improvement over the September 2000 intelligence test that showed mild mental retardation.  The ALJ concluded that the evidence showed an overall increase in functional abilities since the original determination.

The ALJ combined his steps two and three analyses because he found that Child did not have any unconsidered severe impairments in 2000 and had not developed any new impairments since.  (R. 27).  He first evaluated whether Child's original impairments meet or medically equal Listings 112.05 (mental retardation), 112.04 (mood disorders), and 112.11 (ADHD).  He concluded that Child did not meet the existence criteria for Listing 112.05 or the severity criteria for Listings 112.04 or 112.11.  The ALJ then determined that Child's impairments do not functionally equal any of the Listings.  He found that, since June 17, 2005, her impairments of mental retardation and ADHD were not of Listing-level severity, meaning that they did not result in either marked limitations in two, or extreme limitation in one, of the six functional domains of acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, caring for herself, or health and physical well-being.  The ALJ concluded that Child's disability ceased as of June 17, 2005.  (R. 14-28).

### Discussion

Child presents five objections to the ALJ's decision.

**1.  Medical improvement.**  Child challenges the ALJ's finding at the first step of the continued-disability-review process:  she argues that his finding that medical improvement occurred as of June 17, 2005 finds no support in the record. (Plaintiff's Brief (doc. 17) at 13).

Child's argument misunderstands both the ALJ's finding and the scope of the medical-improvement inquiry.  As explained above, the first step in the continued-disability-review process asks "whether there has been medical improvement in the impairment(s) you had at the time of our most recent favorable determination or decision."  20 C.F.R. § 416.994a(b)(1).  The state agency found Child disabled because she met — not medically or functionally equaled — Listing 112.05D for mental retardation.  To meet that Listing requires a full-scale IQ of 60 through 70 and an additional severe impairment.  The Record indicates that the state agency found that Child met Listing 112.5D based on her primary diagnosis of mental retardation, her tested IQ score of 63 (within the required 60-70 range), and her secondary diagnosis of severe ADHD.  Moreover, this is what the ALJ found to have been the basis for the state agency's determination, (R. 17-18, 21), and Child does not dispute that finding.[7]

Child contends that the ALJ found that Child "no longer met" Listings 112.5 (mental retardation), 112.04 (depression), and 112.11 (ADHD) because medical improvement had occurred in those impairments, (Plaintiff's Brief at 13), and she argues that substantial evidence

---

[7] In his second numbered finding, the ALJ wrote that, at the time of Child's initial determination of disability, "claimant had the following medically determinable impairments: mental retardation, a parent/child relationship problem and an Attention Deficit Hyperactivity Disorder.  These impairments were found to meet listing 112.05D . . . ."  (R. 17).  A diagnosis of a parent/child relationship problem appears only once in the record relating to the state-agency's determination of disability in 2000:  the first mental-status-examination report contained that diagnosis for Axis I.  (R. 236, 238).  Neither the second examiner, nor either of the state-agency reviewers made that diagnosis, and the ALJ subsequently describes Child's initial disability determination being based on only the impairments of mental retardation and ADHD.  (Neither does Child rely upon, or cite, this statement by the ALJ in support of her later argument that he erred by not discussing it by name.)  Therefore, this isolated reference by the ALJ to a parent/child relationship impairment appears to be an anomaly and not an accurate statement of a finding.

does not support these findings, (*id*. at 14).[8]  But there is no evidence in the Record that the state agency found that Child had severe impairments of depression or oppositional-defiant-disorder, let alone that these impairments satisfied the Listings for depression, ADHD, or oppositional defiant disorder.  Child simply misreads the Record.

Because mental retardation and ADHD were the only impairments that the state agency found Child had and Listing 112.5D was the only one that the agency found she satisfied, the first step of the continued disability review looks for medical improvement in only those two impairments.  The ALJ compared Child's 2000 full-scale IQ of 63 with Dr. Modlick's May 2005 full-scale IQ of 84 — which Dr. Modlick found placed Child in only the low-average range of intellectual functioning and which is well-outside the 60-70 range required by the Listing — and determined that there had been medical improvement in her impairment of mental retardation and her satisfaction of Listing 112.05D on which her 2000 disability determination had been based.  The significant increase in IQ scores is substantial evidence for the ALJ's determination.

Child also argues that substantial evidence does not support the ALJ's finding regarding the date of medical improvement, June 17, 2005, because no medical evidence specifies that date as the point when improvement occurred.  (Plaintiff's Brief at 14-15).  Although the ALJ did not explain why he selected that date specifically, the reason is evident and substantial evidence supports it.  In finding that medical improvement had occurred, the ALJ relied on the results of Dr. Modlick's IQ tests which were administered on May 23, 2005, one month *before* the ALJ's

---

[8] Child added that substantial evidence does not support a finding of medical improvement in her oppositional-defiant-disorder impairment satisfying Listing 112.08, but she did not include that impairment or Listing in her description of the ALJ's findings.  (*Id*. at 14).

improvement date.  This alone is substantial evidence supporting the ALJ's date of medical

improvement.  In addition, on June 14, 2005, just three days before the ALJ's selected

improvement date, state-agency expert Dr. Kladder submitted his Child Disability Evaluation

Form finding that medical improvement had occurred.  (R. 210).  Dr. Kladder had reviewed the

Record evidence at that time which included Dr. Modlick's report.  It is reasonably likely that

the ALJ intended to adopt, but simply mistook, the date of Dr. Kladder's report as the date of

improvement.

   **2. Due Process.**  Child next argues that the ALJ's decision denied her constitutional due

process of law.  She contends that, although evidence was presented to the ALJ proving that

Child's combined impairments satisfied the Listings for oppositional defiant disorder (112.08),

major depressive disorder (112.04), and ADHD (112.11), he "denied her a fair consideration of

her claim" because he acted without a medical advisor and "arbitrarily rejected all of the

evidence proving disability and simply rubber-stamped the agency's erroneous, unsupported

opinions."  (Plaintiff's Brief at 16-17).  She clarified that he was not asserting the type of due-

process violation where an ALJ displays "extreme conduct or personal bias or hostility toward a

claimant" as addressed in *Keith v. Barnhart*, 473 F.3d 782 (7th Cir. 2007).  Rather, she asserts

that the violation in this case is a manifestation of a much broader and systemic deprivation of

due process:

   The type of denial of due process seen in the instant case is an
institutional-agency wide [*sic*] policy and procedure of only selectively
considering the evidence in the record so as to exclude from the ALJ's decision
any of the evidence which proves a claimant's disability[.]

   The agency and its ALJ simply pretend that there is no evidence in the
record to prove the claimant's case.  The agency and its ALJs persist in using this

17

procedure despite its being repeatedly condemned by the Seventh Circuit, in cases cited below, which has reversed denial decisions where the ALJ selected and discussed only the evidence that supported his denial decision.

By the refusal of the agency and its ALJ to even acknowledge a claimant's evidence and the arbitrary rubber-stamped approval of the agency's denial decision, the review function of this Court is frustrated because meaningful review of the ALJ cannot be performed. These one-sided denial decisions deny a claimant fundamental fairness in the consideration of her disability claim and thus deny her due process of law, requiring reversal of all such unreliable and non-judicial decisions.

(*Id.* at 17-18).

Child does not present or identify any evidence of an SSA "policy and procedure" for ALJs to selectively consider or exclude evidence tending to prove disability or that ALJs institutionally pretend that there is no evidence favoring claimants. Child also fails to provide any legal support explaining and applying the standard to be applied to institutional due-process claims. The three cases that she cites provide no support. Two, *Smith v. Secretary of Health, Education and Welfare*, 587 F.2d 857, 859 (7th Cir. 1978), and *Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir. 2000), do not mention due process.[9] The third, *Ray v. Bowen*, 843 F.2d 998, 1007 (7th Cir. 1988), reversed and remanded a claim because the ALJ failed to obtain a retroactive psychological examination of the claimant to determine if disabling alcoholism existed at the relevant time period. After comparing the situation to a trial judge's due-process obligation to obtain a retroactive examination of a litigant who was possibly incompetent at the time of trial,

---

[9] *Smith v. Secretary* faulted an ALJ's failure to explain with sufficient detail and care the role and advantages of a lawyer to a mentally infirm, unrepresented claimant and the ALJ's failure to fully develop the record when the claimant was unrepresented. It did not address due process. *Smith v. Apfel* held that an ALJ failed to fully develop the record and failed to consider some of claimant's contrary evidence, but not within a due-process framework. Both decisions were based on statutory and regulatory grounds.

the Court held that, "[t]hough [disability claimant] has no analogous due process right to disability benefits, we believe that he is entitled to a fair hearing on this claim and, ultimately, justice." The Court offered no more due-process analysis or discussion with regard to disability evaluations. Whether administrative determinations violate due process and, if so, whether a remedy is available beyond the benefit at issue, are complex questions of fact and law. *See*, *e.g.*, *Liteky v. United States*, 510 U.S. 540, 555-56 (1994); *Schweiker v. Chilicky*, 487 U.S. 412 (1988). It is not a *per se* due-process violation for an ALJ to reject evidence supporting a finding of disability, to not specifically discuss all of the evidence, or to reject a claimant's assertion that a medical expert is required. The Court will not assume Child's burden to research the law of due process, search the record for possible violations, and construct a focused, logical, and persuasive argument applying the law to the facts. Without developed factual or legal support, Child's institutional due-process argument fails.[10]

    As far as an individualized due-process argument, Child also failed to make a case. She contends first that she "met her burden of proof by offering to the ALJ substantial psychiatric treatment and examination evidence proving" that her impairments satisfied three Listings and that she has marked to extreme functional impairments in three domains. However, our task is to determine whether there is substantial evidence in the Record to support the ALJ's decision, not Child's claim, and we do not weigh the evidence ourselves to determine if Child has "proved" her case. Because the substantial-evidence standard is so low — less than a preponderance — it

---

[10] In addition, Child fails to demand or define any remedy for such an agency-wide deprivation of due process; she asks only for the continuation of her personal disability benefits, which are otherwise obtainable under the Social Security Act and regulations.

may uphold both a decision for and against benefits.

Child next argues that the ALJ denied her constitutional due process by acting without a medical advisor and arbitrarily rejecting all of her evidence.  She later argues that both of these deficiencies constitute legal errors under the Social Security Act and regulations.  Because she fails to develop a factual or legal argument as to how these errors constitute due-process violations or why they should not or can not be addressed and fully remedied under ordinary 42 U.S.C. §  405(g) administrative review, we conclude that she has not shown a due-process violation and shall examine both alleged errors below according to statutory and regulatory standards.

**3.  Failure to cite or discuss Listing 112.08.**  Child argues that the ALJ erred by not evaluating or mentioning Listing 112.08, personality disorders, because she was frequently diagnosed with, and received psychiatric treatment for, oppositional defiant disorder.  (Plaintiff's Brief at 19).  In support, she cites four instances in the records of BehaviorCorp. where the diagnosis appears:  (1) November 2004 initial comprehensive assessment (R. 244); (2) January 2005 psychiatric assessment (R. 249); (3) August 2007 treatment plan (R. 340); and (4) October 2007 termination summary (R. 345).[11]  All of the cited records show a diagnosis by BehaviorCorp medical and non-medical personnel of "oppositional defiant disorder" on Axis I which covers "Clinical Disorders" and "Other Conditions That May Be a Focus of Clinical

---

[11]  Oppositional defiant disorder does not appear as a diagnosis — let alone a severe or otherwise functionally limiting one — in any of the other medical reports or evaluations in the record.  Thus, if the ALJ had stated that it was not a severe impairment, there would have been substantial evidence to support that finding.  As it is, however, the issue of his duty to articulate his evaluation of the evidence arises because he made no mention of the diagnosis at all.

Attention," *DSM-IV-TR* at 27.

Child does not argue that these diagnoses alone are sufficient evidence that oppositional defiant disorder is a severe impairment for her — *i.e.*, that it is more than minimally functionally limiting — and she points to no evidence of functional limitations attributable to this impairment that obligated the ALJ to separately address the disorder as a severe impairment.  She likewise pointed to no medical-expert opinion in the Record concluding that her oppositional defiant disorder, alone or in combination, satisfies the Listing for 112.08 such that an express analysis and finding by the ALJ that it did satisfy the Listing would have been supported by substantial evidence.  In addition, BehaviorCorp personnel recorded oppositional defiant disorder as an Axis-I diagnosis, whereas personality disorders are diagnosed on Axis II.  Because BehaviorCorp itself did not consider the diagnosis as a personality disorder, the ALJ was not obligated to address whether it satisfies Listing 112.08 on personality disorders.  For all these reasons, we find that Child has not shown that the ALJ was required to separately discuss his analysis of whether Child had the severe impairment of oppositional defiant disorder and whether it satisfied the Listing.

Finally, we agree with the Commissioner that, even if the ALJ had been required to articulate an analysis of oppositional defiant disorder under Listing 112.08, he in effect did so because the severity criteria that are required to satisfy Listing 112.08 are also required for Listings 112.04 (mood disorders) and 112.11 (ADHD), which the ALJ did exhaustively discuss and found lacking.  20 C.F.R. Part 404, Subpart P, Appendix 1, Part B, §§ 112.04B, 112.08B, and 112.11B (all requiring "two of the appropriate age-group criteria in paragraph B2 of

112.02").[12]  (R. 18-27).

   **4.  Medical advisor.**  Child argues that it was error for the ALJ to not call a medical

advisor (either a pediatric pulmonologist, speech therapist, or developmental child psychologist)

to testify on the issues of medical and functional equivalence.  (Plaintiff's Brief at 20). She relies

on the following language by the Court of Appeals for the Seventh Circuit:

> Moreover, as is evident from the perfunctory discussion of the listing, the
> ALJ never consulted a medical expert regarding whether the listing was equaled.
> Whether a claimant's impairment equals a listing is a medical judgment, and an
> ALJ must consider an expert's opinion on the issue.  See 20 C.F.R. § 404.1526(b)
> ("Medical equivalence must be based on medical findings . . . .  We will also
> consider the medical opinion given by one or more medical or psychological
> consultants designated by the Commissioner in deciding medical equivalence.");
> S.S.R. 96-6p at 3 ("[L]ongstanding policy requires that the judgment of a
> physician (or psychologist) designated by the Commissioner on the issue of
> equivalence on the evidence before the administrative law judge or the Appeals
> Council must be received into the record as expert opinion evidence and given
> appropriate weight."), reinstating S.S.R. 83-19; *see Farrell v. Sullivan*, 878 F.2d
> 985, 990 (7th Cir.1989) (concluding that ALJ complied with requirement of
> Social Security Ruling 83-19 that he consider a consulting physician's opinion
> regarding medical equivalency).

*Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004).  She also relies on the corollary principle

that, on medical issues, an ALJ may not substitute his layman's opinion for that of medical

professionals.  *Rohan v. Chater*, 98 F.3d 966, 970-71 (7th Cir. 1996).

   The Commissioner does not dispute that expert medical opinion on equivalence is

required, but argues that such opinion was supplied by the two state-agency psychologists who

--------

   [12] For Child's age, Listing 112.02B2 requires at least two of the following:  marked
impairment in age-appropriate (1) cognitive/communicative function, (2) social functioning, (3)
personal functioning; or (4) marked difficulties in maintaining concentration, persistence, or
pace.  20 C.F.R. Part 404, Subpart P, Appendix 1, Part B, § 112.02B2 a-d.

examined the record and concluded that there was no equivalence.  The Commissioner also

argues that Child forfeited this issue by failing to raise it before the ALJ and the Appeals

Council.  (Defendant's Memorandum (doc. 23) at 16-17).  He contends that forfeiture occurred

because Child was represented by counsel who (1) failed to object to the Record evidence; (2)

did not request, or point out the lack of, additional medical opinion on equivalence before or

during the hearing; (3) asked for and received additional time after the hearing to submit new

evidence but submitted no medical-equivalence evidence; and, (4) in requesting Appeals Council

review, did not argue that the required expert equivalence evidence was lacking.

The two state-agency psychologists submitted their opinions in June 2005 (Dr. Kladder)

(R. 210) and August 2005 (Dr. Pressner) (R. 198).  At that point, the evidence before them

consisted of the February 2005 forms completed by Mother, the April 2005 questionnaire

completed by Child's teacher, and Dr. Modlick's report of his May 2005 examination of Child.

It was not until after Drs. Kladder and Pressner reviewed this evidence that Dr. Wooden's report

of his November 2005 psychological examination of Child (R. 192), the voluminous 2004 to

2007 records from BehaviorCorp (R. 241-347), and the 2008 records from Midtown Community

Mental Health Center (R. 360-418), became part of the Record.  Aside from the 2004 and some

of the 2005 records from BehaviorCorp, none of this additional evidence even existed at the time

the state-agency reviewers rendered their opinions on medical equivalence.  These records are

significant substantive evidence regarding Child's condition and functional abilities and any

medical opinion rendered on the subject of equivalence without taking these records into

consideration is incomplete and ineffective.  Therefore, while the Commissioner is correct that a

reviewing state-agency medical expert can supply the required expert opinion on medical and

functional equivalence, Social Security Ruling ("S.S.R.") 96-6p, his argument that such an opinion on the Record evidence was rendered in this case is unconvincing.

That leaves the question of whether Child has forfeited this ground for a remand because she failed to present it before the ALJ or the Appeals Council.  Unfortunately, the Commissioner did not support his argument that issue exhaustion is required in Social Security disability cases with authority, but it was not difficult to discover that he was wrong at least as far as the Appeals Council level.  The Supreme Court held in *Sims v. Apfel*, 530 U.S. 103, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000), that issue exhaustion is not required before the Appeals Council.  The decision specifically declined to address whether exhaustion applies at the ALJ level, *id*. 120 S.Ct. at 2083-84, and, as a plurality opinion, it did not establish a standard by which to easily resolve the question.  The Court unanimously agreed that, as a general matter of administrative law and practice, issue exhaustion is required, *id*.,[13] but it did not agree on the rationale why it is not required in Social Security Appeals Council proceedings.  A majority (the plurality and Justice O'Connor) agreed that issue exhaustion is usually required by statute and/or agency regulation, but that both of these grounds are lacking in Social Security disability determinations. The majority also agreed that, in such a situation, issue exhaustion is often judicially imposed by analogy to judicial issue exhaustion, and that "the desirability of a court imposing a requirement of issue exhaustion depends on the degree to which the analogy to normal adversarial litigation

---

[13] The four justices in the plurality wrote that this principle applied "as a general rule," *id*. 120 S.Ct. at 2084; the four dissenters agreed that it applied "[u]nder ordinary principles of administrative law," *id*. at 2087 (J. Breyer dissenting), and J. O'Connor separately wrote that "the Court is unanimous" that "in most cases" exhaustion is required. *id*. at 2086 (J. O'Connor, concurring).

applies in a particular administrative proceeding." *Id*. at 2085.

> Where the parties are expected to develop the issues in an adversarial
> administrative proceeding, it seems to us that the rationale for requiring issue
> exhaustion is at its greatest.  Where, by contrast, an administrative proceeding is
> not adversarial, we think the reasons for a court to require issue exhaustion are
> much weaker.

*Id*. (citations omitted).

This was the extent of the Court's majority rationale.  The plurality went on to reason that the inquisitorial, or investigative, nature of SSA's proceedings — where "[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits" — represents the most pronounced difference from the adversarial nature of judicial proceedings. Focusing on the simplified procedures for requesting discretionary Appeals Council review, which do not require an itemization or argument of errors and "strongly suggests that the Council does not depend much, if at all, on claimants to identify issues for review," *id.* at 2086, the plurality concluded that the analogy to normal adversarial litigation was at its weakest in Appeals Council proceedings and did not justify imposing issue exhaustion.  *Id.*

Justice O'Connor, concurring in the judgment and the majority rationale above, reasoned that the lack of notice in SSA's regulations that issue exhaustion is required was sufficient reason alone to not impose exhaustion — even more so because those regulations "affirmatively suggest that specific issues need not be raised before the Appeals Council."  *Id.* at 2086-87 (J. O'Connor, concurring).[14]

---

[14] The four dissenters rejected the adversarial-inquisitorial scale as the standard by which to impose issue exhaustion.  Agreeing with the majority's view that administrative issue exhaustion is analogous to judicial exhaustion and with the plurality's view that SSA's

The Court of Appeals for the Seventh Circuit has yet to definitively address *Sims*'s rationale or rule whether issue exhaustion is required at the ALJ level.  *See Kepple v. Massanari*, 268 F.3d 513, 516-17 (7th Cir. 2001).  Pre-*Sims* decisions require issue exhaustion before the ALJ.  *Banuelos v. Apfel*, 165 F.3d 1166, 1173 (7th Cir. 1999) (exhaustion required before both Appeals Council and ALJ), and *Brewer v. Chater*, 103 F.3d 1384, 1393 (7th Cir.1997) (same), *both overruled on other grounds*, *Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 1999) (overruling only as to Appeals Council exhaustion based on Council's procedures not requiring issue presentation).  In a decision rendered six years after *Sims*, the Court of Appeals held that a claimant had not forfeited his argument that an ALJ failed to inquire about the consistency of a vocational expert's testimony with the Dictionary of Occupational Titles because a Social Security Ruling, 00-4p, imposes an affirmative duty on ALJs to make that inquiry.  *Prochaska v. Barnhart*, 454 F.3d 731 (7th Cir. 2006).  *Prochaska* neither cited *Sims* nor applied *Sims*'s litigation-analogy analysis to characterize ALJ proceedings in general.  Thus, *Prochaska* did not declare a general rule of ALJ issue exhaustion but requires an analysis of the particular errors alleged in a case.  In a decision quoted by Child, the Court of  Appeals previously observed that

procedures are non-adversarial, the dissent nonetheless found that these principles argued in favor of imposing exhaustion.  They reasoned that administrative exhaustion is the norm because of the principles of avoiding premature interruption of the agency's processes, enabling the expert agency to develop the facts; avoiding judicial intervention by encouraging agency resolution; administrative autonomy to discover and correct its own errors; and discouraging claimants from ignoring agency procedures.  These principles, they found, apply with particular force in SSA disability cases that involve specialized agency knowledge.  They assumed that the plurality certainly would not excuse exhaustion at the ALJ level.  The dissent identified one exception to issue exhaustion in disability cases:  when a claimant is not represented by counsel.  Because the Appeals Council's procedures might mislead an unrepresented claimant to believe that he need not present all of his issues when requesting review, the dissent reasoned that forfeiture of judicial review would not be imposed.  *Sims*, 120 S.Ct. at 2087-90 (J. Breyer, dissenting).

affirmative duties imposed on ALJs are examples of how SSA adjudications depart from the adversary model, *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000), and it has often observed that disability determinations are hybrid adversarial-inquisitorial proceedings because of the affirmative duties imposed on ALJs, *Overman v. Astrue*, 546 F.3d 456, 465 (7th Cir. 2008); *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002); *Kendrick v. Shalala*, 998 F.2d 455, 456 (7th Cir. 1993).

Relying on the Court of Appeals' decision in *Barnett*, Child argues that the ALJ had an affirmative duty in this case to call a medical expert to testify on the question of medical equivalence. *Barnett* held that ALJs have such a duty because equivalence is a medical judgment and Social Security Ruling 96-6p requires ALJs to obtain a medical opinion on equivalence. *Barnett*, 381 F.3d at 370. For the former reason, the Court quoted the following language from a previous version of 20 C.F.R. § 404.1526(b):[15] "Medical equivalence must be based on medical findings . . . . We will also consider the medical opinion given by one or more medical or psychological consultants designated by the Commissioner in deciding medical equivalence." *Id.* But SSA removed the first quoted sentence from its regulation two years after *Barnett* in response to an earlier decision, *Hickman v. Apfel*, 187 F.3d 683 (7th Cir. 1999), which interpreted this language to mean that equivalence determinations must be based solely on medical evidence. In revising § 404.1526(b), SSA explained that it had intended the language "only to exclude consideration of the vocational factors of age, education, and work experience," not to limit the evidence to medical sources. 71 Fed. Reg. 10419, 10421, 2006 WL 467856

---

[15] The corresponding section governing the SSI program is 20 C.F.R. § 416.926.

(Mar. 1, 2006).  Current SSA regulations and rulings state that the question of Listing
equivalence is not a medical issue but an ultimate issue reserved to the Commissioner, 20 C.F.R.
§ 416.927(e);[16] S.S.R. 96-5p (clarifying that Listings equivalence is not a medical issue but an
administrative finding that is dispositive of a case),[17] and that, while ALJs must always carefully
consider medical source opinions about equivalence, such opinions are never entitled to
controlling weight or special significance, *id.*

The second reason found in *Barnett* for an ALJ's affirmative duty to obtain expert
medical testimony on Listing equivalence is the mandate of SSR 96-6p.  This Ruling states that,
although an ALJ, as the determiner of the ultimate question of Listing equivalence, is not bound
by medical opinions or findings, "longstanding policy requires that the judgment of a physician
(or psychologist) designated by the Commissioner on the issue of equivalence on the evidence
before the administrative law judge or the Appeals Council must be received into the record as
expert opinion evidence and given appropriate weight."  The Ruling also states, however, that, in

---

[16] "Opinions on some issues, such as the examples that follow, . . . are not medical
opinions . . . but are, instead, opinions on issues reserved to the Commissioner because they are
administrative findings that are dispositive of a case; *i.e.*, that would direct the determination or
decision of disability.  *   *   *  Although we consider opinions from medical sources on issues
such as whether your impairment(s) meets or equals the requirements of any impairment(s) in
the Listing of Impairments . . . your residual functional capacity . . . or the application of
vocational factors, the final responsibility for deciding these issues is reserved to the
Commissioner.  . . .  We will not give any special significance to the source of an opinion on
issues reserved to the Commissioner . . . ."  20 C.F.R. § 416.927(e)(1)-(3).

[17] The Ruling explains that "[a] finding of equivalence involves more than findings about
the nature and severity of medical impairments.  It also requires a judgment that the medical
findings equal a level of severity . . . *i.e.*, that the impairment(s) is '*   *   *  severe enough to
prevent a person from doing any gainful activity.'  This finding requires familiarity with the
regulations and the legal standard of severity . . . .   Therefore, it is an issue reserved to the
Commissioner."

the circumstance of Child's case, obtaining such an opinion is discretionary with the ALJ:

> [A]n administrative law judge and the Appeals Council must obtain an updated medical opinion from a medical expert in the following circumstances:
>
> ! When no additional medical evidence is received, but *in the opinion of the administrative law judge or the Appeals Council* the symptoms, signs, and laboratory findings reported in the case record suggest that a judgment of equivalence may be reasonable; or
>
> ! When additional medical evidence is received that *in the opinion of the administrative law judge or the Appeals Council* may change the State agency medical or psychological consultant's finding that the impairments(s) is not equivalent in severity to any impairment in the Listing of Impairments.

(Emphases added).  Child's case presents the second circumstance — additional evidence was added to the Record after the state-agency medical experts had reviewed the file and opined that her impairments did not equal the Listings — and the ALJ had discretion to determine whether the additional evidence might have changed the state-agency experts' equivalence opinions.

In addition, the well-established principles that a claimant bears the burden of establishing satisfaction of the Listings, *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006), and that an ALJ's duty to fully develop the record by making inquiry and seeking additional evidence is lessened when a claimant is represented by counsel, *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007); *Glenn v. Secretary of Health and Human Services*, 814 F.2d 387, 391 (7th Cir. 1987), may influence the exhaustion question.

Therefore, because the interpretation of the governing standards is unsettled and the application of the standards to the facts in this case is complex and debatable, it is unclear whether Child forfeited her medical-equivalence argument by failing to present it to the ALJ.

But just as we demand developed legal and factual argument from claimants, we demand them of the Commissioner as well.  The Commissioner did not discuss or cite any of the relevant authorities to us and it was his duty — and interest — to argue his positions regarding the proper application of *Sims*, *Prochaska*, 20 C.F.R. §§  416.926(e) and 416.927(e), S.S.R. 96-6p, and any other authorities in support of his forfeiture argument.  We will not assume or supply the Commissioner's positions or arguments.  *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.1991) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived (even where those arguments raise constitutional issues).").

Therefore, because the Commissioner himself has forfeited his argument that Child forfeited hers, this case must be remanded to the Commissioner with instruction to obtain and consider an updated medical opinion regarding whether, based on all of the evidence in the Record, Child's severe impairments, singly or in combination, medically or functionally equal any of the Listings of Impairments.

**4.  Ignored and selectively considered evidence.**  Child argues that substantial evidence does not support the ALJ's termination of disability status because he ignored or selectively considered treatment and examination evidence and "simply adopted the agency's erroneous, unsupported opinions."  (Plaintiff's Brief at 21).  She specifies the flaw that these errors caused in the ALJ's disability determination:  "[t]he ALJ ignored, without explanation, misstated or arbitrarily rejected the following items of evidence *showing no medical-psychological improvement as of June 17, 2005*, thus ignoring evidence proving continuing total

disability." (*Id.* at 22 (emphasis added)).  There follows an eleven-page recitation of evidence that Child contends the ALJ ignored or, in two instances, mischaracterized when reaching his decision that there had been medical improvement in Child's original impairments.  (*Id.* at 22-33).  This ignored evidence includes all or portions of 22 reports from BehaviorCorp, 11 reports from Midtown Community Mental Health Center, and the DHO's decision.  After this itemization, she concludes:  "Plainly, when all the evidence is considered, [Child's] impairments did not improve on June 17, 2005 as the ALJ determined and in fact they worsened due to her Oppositional Defiant Disorder, Attention Deficit Hyperactivity Disorder and Major Depression." (*Id.* at 32).

This argument is related to Child's first one that we addressed above, *viz.*, that substantial evidence does not support the ALJ's finding that medical improvement occurred as of June 17, 2005.  (*Id.* at 13).  We determined above that substantial evidence supported the ALJ's finding of medical improvement.  Now Child argues that the ALJ failed to consider all of the evidence contrary to that finding.  Our earlier determination, therefore, does not resolve Child's present argument because, even if there is substantial evidence in the Record to support the ALJ's finding of improvement, if he failed or refused to consider material evidence that is contrary to that finding, then that would constitute legal error requiring reversal and remand for reconsideration.

But Child's present argument suffers from the same misunderstanding that doomed her earlier one.  As we explained above, Child's original finding of disability was based only on the impairments of mental retardation and ADHD, which were found to meet Listing 112.05D based

31

on her diagnosis of mental retardation, an IQ score between 60 and 70, and the additional severe

impairment of ADHD.  In addition, the ALJ's finding of medical improvement in her original

impairments and disability was based only on Child's significantly improved IQ score that was

above the Listings range.  Yet none of the allegedly ignored, misstated, or rejected evidence

recited in Child's eleven pages of argument concerns Child's IQ scores.  She makes no

argument, and it is not evident, that any of the allegedly ignored evidence proves or even

suggests that the IQ scores relied upon by the ALJ were inaccurate or even questionable.  Rather

Child argues that her itemized ignored evidence shows that she had problems with, *inter alia*,

behavior, concentration, ADHD, school work, and communication, all of which, however, is

irrelevant to the ALJ's finding of medical improvement in her  case.

     Child has not shown that the ALJ ignored, misstated, or rejected all, or any, evidence in

the Record that was contrary to his finding that there was medical improvement in the

impairments that were found disabling at the time of the state agency's determination of

disability.  20 C.F.R. § 416.994a(b)(1).

     But perhaps Child really wanted to make a broader argument, one not limited to the

ALJ's medical-improvement determination at step one of the continued-disability-review

process.  Perhaps she wanted to argue that the ALJ ignored her list of evidence when making his

determinations at steps two and three, as well — *i.e.*, his determinations of whether her original

impairment(s) still meet the Listing(s) that she originally was found to have met (step two) and

whether her current impairment(s) currently meet, medically equal, or functionally equal any of

the Listings (step three).  But if she intended to present those addition arguments, she neither

32

stated them nor presented sufficiently developed bases for them.  Twice, at the start and at the end of her recitation of ignored evidence, Child clearly asserted error only in the ALJ's step-one medical-improvement determination.  (Plaintiff's Brief at 22, 32).  We are entitled to assume that She means what she so clearly states.

Moreover, if, by "ignored," she means that the ALJ failed to address in his decision each of her itemized excerpts from various reports, then she failed to argue the significance of those excerpts to his steps two and three determinations or her claim for continued disability.  An ALJ may not ignore entire lines of evidence that are contrary to his findings, *Zurawski v. Halter*, 245 F.3d 881, 888-89 (7th Cir. 2001), but neither is he required to mention or articulate his evaluation of each piece of evidence in the record, *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008).  He is required only to articulate enough of his evaluation of the significant evidence so that a reviewing court can be assured that he considered the important evidence, can trace the path of his reasoning, and can conclude that he built an accurate and logical bridge from the evidence to his decision.  *Id.*; *Carlson v. Shalala*, 999 F.2d 180, 181(7th Cir. 1993); *Zalewski v. Heckler*, 760 F.2d 160, 166-67 (7th Cir. 1985).  In light of this standard, a bare list of unmentioned evidence is insufficient to show that the ALJ erred in not addressing each listed item in his decision.  Child needed to explain the significance of the unmentioned evidence and why, in the context of the Record as a whole and the ALJ's rationale, the ALJ's failure to specifically address the evidence means that he failed to build his bridge between evidence and conclusion and prevents us from tracing the course of his reasoning.  We will not develop Child's argument for her.

33

Child has not shown that the ALJ ignored, misstated, or rejected significant evidence. Our survey of Child's list, the Record, and the ALJ's decision reveals no evident omissions of significant lines of evidence or evident failures to consider substantial evidence contrary to his decision.

**5. Credibility.**  Child finally argues that the ALJ erred when he found that her statements about the disabling extent of her symptoms were not credible.  Again, however, she provided only a bare list of asserted errors:

- His findings "are contrary to the controlling evidence in the record he ignored or arbitrarily rejected . . . ."

- His findings are "contrary to Social Security Ruling 96-7p . . . ."

- He "never accurately considered the factors required to be considered by Social Security Ruling 96-7 [*sic*] and by 20 C.F.R. §§ 404.1529, 416.929."

- "For the requirements of SSR 96-7p and the regulation, the ALJ substituted his own layman's pediatric-child psychology opinions, based on only selected portions of the evidence."

- "Further, he ignored the quite severe behavioral problems caused by [Child's] mental illnesses."

(Plaintiff's Brief at 33-34).  Because Child provided only bare conclusions, she forfeited these arguments by failing to minimally develop them factually and legally.  However, she does sufficiently assert two errors.

First, she contends that the ALJ's reliance on "objective medical evidence" on page twenty-one of his decision was contrary to SSR 96-7p.  (*Id*. at 34).  Explaining the standard for credibility determinations, the ALJ wrote:

In determining the degree of limitation in each of the six functional domains for

34

the period since June 17, 2005, I have considered all symptoms and the extent to
which these symptoms can reasonably be accepted as consistent with the
objective medical evidence and other evidence, based on the requirements of 20
CFR 404.1529 and SSRs 96-4p and 96-7p.

(R. 21) (emphasis added).  Child argues that the ALJ's expressed reliance on objective medical

evidence is contrary to this passage from SSR 96-7p:[18]

An individual's statements about the intensity and persistence of pain or other
symptoms or about the effect the symptoms have on his or her ability to work
may not be disregarded solely because they are not substantiated by objective
medical evidence.

SSR 96-7p, Purpose.

Child's argument is frivolous.  As her own direct quotations demonstrate, the ALJ wrote

that he considered the extent to which Child's alleged symptoms were "consistent" with the

objective medical evidence in the Record, not whether her alleged symptoms were

"substantiated" by objective medical evidence.  Further, his description of the standard that he

applied is taken directly from SSR 96-7p itself:

These provisions of the regulations provide that an individual's symptoms,
including pain, will be determined to diminish the individual's capacity for basic

---

[18] The quotation is from the fourth 'particular emphasis' in the Purpose section of the
Ruling, which reads in full:

In determining the credibility of the individual's statements, the adjudicator must
consider the entire case record, including the objective medical evidence, the
individual's own statements about symptoms, statements and other information
provided by treating or examining physicians or psychologists and other persons
about the symptoms and how they affect the individual, and any other relevant
evidence in the case record.  An individual's statements about the intensity and
persistence of pain or other symptoms or about the effect the symptoms have on
his or her ability to work may not be disregarded solely because they are not
substantiated by objective medical evidence.

work activities to *the extent that the individual's alleged functional limitations and restrictions due to symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence in the case record.*

*Id.*, Introduction.[19]

Second, Child argues that the ALJ's "emphasis" on her non-compliance with her prescribed medications also violated SSR 96-7p because he failed to determine the reason for her non-compliance, "such as poverty and her mother's apparent mental retardation." (Plaintiff's Brief at 34). In a previous section of her brief, Child argued that the ALJ's "condemnation of her failure to take her medication as prescribed ignored the fact that she was only eight years old. The ALJ seems to imply that the only reason she continued to have severe impairments was because she was noncompliant with her medications, i.e. that her disability was self-imposed." (*Id.* at 27).

Child did not identify the parts of the ALJ's decision where he "emphasized" or "condemned" her non-compliance or "seemed to imply" that it was the only reason she is impaired today. She does not explain how the ALJ's comments on her non-compliance figured

---

[19] SSR 96-7p also contains the following pertinent provision:

One strong indication of the credibility of an individual's statements is their consistency, both internally and with other information in the case record. The adjudicator must consider such factors as:

The degree to which the individual's statements are consistent with the medical signs and laboratory findings and other information provided by medical sources, including information about medical history and treatment.

*Id.*, Introduction, Consistency.

36

into his credibility finding.  She fails to point to any evidence indicating that her non-compliance

was — in either fact, likelihood, or possibility — due to poverty or her mother's mental

retardation.  Neither does she cite to or explain what part of SSR 96-7p the ALJ's comments on

non-compliance violated.  Again, because these are all crucial, but missing, parts of the factual

and legal bases for her argument that we will not find or construct for her, her argument is

forfeited.

      Alternatively, reviewing the ALJ's decision, we find no evident error.  His most

extensive discussion about Child's medication compliance occurred in his step-two analysis

when he addressed whether her original impairments currently meet or medically equal the

Listings.  (R. 19).  He noted the following entries in BehaviorCorp's treatment records:  (1)

compliance problems were noted at the beginning of the 2005 school year; (2) Child had mild

symptoms when on medication and was more impulsive when off medication; (3) additional

medication-compliance problems were referenced; and (4) it was noted that her behavior

problems were minimal on medication and she was aggressive and defiant when off her

medication.  The ALJ also noted that BehaviorCorp's records generally showed improvement in

Child's behavior; better performance in school and at home; significant improvement and

continued display of appropriate behaviors in 2006 and 2007; and, in June 2007, her ability to

manage impulses and anger had improved even without medication.  In discussing the Listings'

severity criteria for maintaining concentration, persistence, and pace, the ALJ wrote:  "Some

problems were noted when she was not compliant with medication.  On the termination summary

from BehaviorCorp it was noted the hyperactive and disruptive behaviors reported at intake were

not present for the last several years of treatment due to effective medication regulation and

administration."  (R. 20).

The ALJ's next comments on Child's medication compliance appear in his discussion of whether Child's impairments functionally equal the Listings.  Here, the ALJ twice noted Behavior Corp's termination summary showing effective behavior control in recent years due to medication.  He first referred to it in support of his finding that Child's statements of disabling symptoms were not credible because the Record showed an increase in her functional abilities since she was found disabled.  (R. 22).  He next referred to the summary when discussing the functional domain of "attending and completing tasks":

> Problems with disruptive and impulsive behavior are noted in the record, however, they have been under good control when the claimant has taken her medication.  This is evidenced in the September 2007 termination summary of BehaviorCorp, the claimant's treatment source, which noted hyperactive and disruptive behaviors reported at intake were not present for the last several years of treatment due to effective medication regulation and administration.  Although psychological consultants with (DDS) found no limitation in this area, the claimant has some problems in this area when she is not given her medication.

(R. 24) (citations omitted).

Rather than "condemn" or "emphasizing" Child's non-compliance with her medications, the ALJ in these passages noted the *effectiveness* of her medications in controlling her behavioral problems.  He concluded that Child's overall behavioral functioning improved since 2000 and that her problems were not disabling by her onset date, despite occasional episodes of behavioral difficulty when she is off her medications.  He apparently found that those occasional episodes were not frequent or severe enough to render her functionally disabled. The ALJ's decision is not fairly interpreted as finding that Child is actually currently disabled but no longer due benefits because she is not taking her medications.

38

SSA regulations require child claimants to follow prescribed treatments in order to obtain benefits, if those treatments can reduce their functional limitations so that they are no longer disabled.  20 C.F.R. § 416.930(a).  If, without a good reason, effective prescribed treatments are not followed, then benefits will be stopped.  *Id*. § 416.930(b).  The ALJ's decision does not cite this regulation or discuss possible reasons for Child's occasional episodes of non-compliance. But, instead of an indiction of error, this omission is consistent with his finding that she is not actually disabled.  The ALJ reasonably relied on evidence showing non-disabling behavior while Child is on medication, coupled with occasional episodes of behavioral problems when off medication, as proof of the effectiveness of her prescribed medications and other treatments, and 20  C.F.R. § 416.930 allowed him to assume that Child will continue following her effective prescribed treatments and, thus, that her current state of functional ability will continue.

Child has not shown that the ALJ erred in making his credibility determination.

## Conclusion

For the reasons set forth above, this case will be remanded to the Commissioner with instructions to him to obtain and consider an updated medical opinion on whether the plaintiff's impairments, separately or in combination, medically or functionally equal any of the Listings of Impairments.

**SO ORDERED:**  3/23/10

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana